The next case this morning is 19-1377 Arabian Support & Services Co. v. Textron Systems Corporation Let's let your counsel all get seated before you start. Okay, Mr. Gaynor, go ahead. Thank you, Your Honor. Martin Gaynor on behalf of Arabian Support & Services Co., who I'll refer to this morning as a SASCO. Before I begin, Judge Lynch, with your permission, I'd like to reserve two minutes for rebuttal. Yes, you may have it. Okay, I'd like to start this morning, if I could, to try to focus as clearly and as succinctly as I can on what we believe are the two fundamental errors that require reversal in a trial in this matter. The first one can be found at pages 34-38 of the District Court's decision, and this is where the linchpin of the dismissal of counts 1-4 can be found. The Court properly starts off by finding that, when all reasonable inferences are drawn in its favor, a SASCO reasonably relied on TSC's promise that it would be compensated through its work on offsets, which TSC treated as separate from the consulting agreement going so far as to create two books. But then the District Court goes on and says that the counts 1-4 must be dismissed because a SASCO did not obtain offset credits and did not obtain an offset waiver, and further finds that there was no interference by TSC with a SASCO's ability to obtain those offsets or waiver, and that is simply false, incorrect, based on the record. Which part of it? Excuse me? Which part of it? The record's clear. No credits were obtained, no waiver was obtained, so are you down to your interference argument? Correct. What is incorrect is that there was no interference. Not only was there interference, TSC completely eliminated a SASCO's ability to either work on offsets or to get a waiver. I thought there were continuing discussions where your client kept proposing ways of accomplishing offsets for a period of time, but the decision is actually in the control of the Saudi Arabian government. It's not in Textron's control. That is true, but what you're referring to, Your Honor, is there were communications between a SASCO and TSC back in the 2006 time frame, and the specific dates are in the record, where a SASCO proposed to TSC a number of offset proposals, only one of which TSC forwarded to Saudi Arabia. But what's more important is... I'm sorry, is your claim that TSC was obligated whenever your client came up with an idea to pass it on to the Saudis? No, not every single one, but they were obligated to work with a SASCO in good faith on these offset projects. So what's the evidence of lack of good faith? The evidence is in 2011. In 2011 in the record, and it's very clearly shown, in May of 2011, TSC, a man by the name of Mr. Fogarty at TSC, who was in charge of their offset program, writes an internal memorandum in an internal email where he says, we need to cancel the Blenheim agreement because it's too expensive. And they start work, and there's an internal memorandum also in May, May 9th, which is in Appendix 5842, where Mr. Fogarty writes, it's good to know that this agreement, meaning the SASCO-Blenheim agreement, is terminated automatically when the TSC-Blenheim agreement is terminated. So the evidence clearly shows, and at the very least provides for an inference, that in May of 2011, Textron knew that it was going to cut off a SASCO's ability to participate in offsets. And yet, there's no communication whatsoever from TSC to a SASCO. And what's worse is that in November of 2011, TSC in fact terminates Blenheim. And the same day, Mr. Boyle from TSC has a conversation with Mr. Althassan talking about offsets, clearly leading a SASCO, Mr. Althassan again is the principal of a SASCO, to believe that they're still going to be involved in the offsets, but at the very same point in time is in the process of terminating Blenheim, which the memo I just referred you back to in May of 2011 shows that Textron knew would cut off a SASCO as well. But even after that termination, isn't it a fact that Textron continued to work with the SASCO, and in fact an offset proposal was submitted to the Saudi government? I'm referring to the first pilot training? Yes, that was prior in time. That was prior? Yes, that was prior to the 2011 termination. There were two parts to the question. The first is didn't TSC continue to work with your client? The second part refers to a specific submission. You've answered as to the second part, but you haven't answered as to the first part. As I said, in November of 2011, I'll try to find the site. Just to answer the question, did TSC continue to work? It's my understanding, TSC said they would continue to work together, but not specifically with respect to offsets. They did, you're right, Your Honor. They did work together, but one thing was TSC wanted a SASCO to set up a demonstration for its drone product, which a SASCO did, and TSC said they did a superb job, but it didn't have to do with offsets. But the important thing about these offsets is that if we look at the Blenheim agreement, the two, the tripartite agreement, that activity was key to when the supply agreement was signed. The supply agreement does not get signed until 2013, August of 2013. You'll hear, I'm sure, Textron say the waiver had to be obtained under those written agreements within six months of the supply agreement getting signed, which again is August of 2013, and then the offset credits had to be obtained again under the Blenheim agreement, which TSC terminated two years after the supply agreement was signed. Contract does say that. Yes, it does, Your Honor. And none of that has happened. But here's the point. Here's the fundamental, fundamental point. Go ahead. The supply agreement was signed in August of 2013. Nine days later is when TSC sends its letter to a SASCO saying we are not renewing the consulting agreement that's going to expire at the end of this month, and we are not aware of any other obligations between our organizations, which means there's no offset obligation anymore. I'm sorry. Why is this evidence of bad faith? As best I can understand, that was an entirely rational statement by TSC as to its assessment. You don't claim that it was a dishonest statement, so I don't see how this is helping your argument. No, what dishonest is, let's go back to where we started. The judge in the lower court found that a SASCO reasonably relied on promises that it would get paid for offsets, okay? Yeah, and then the judge goes on, and then you presented some argument to us that the canceling of the Blenheim contract, which Blenheim has never said apparently was illegal, hurts your client. I can understand the theory it hurts your client, but I don't see any evidence that the canceling of that was meant to hurt your client. It was, Your Honor, because if you look at the May 2011 memorandum that I referred you to before, it's clear from those that TSC was going to terminate Blenheim because it was too expensive, and as a result of that, terminate a SASCO's rights to offset, which it had already promised. But it never told the SASCO, because it wanted a SASCO on board until the supply agreement finally got signed in August of 2013, 18 months or so later. And then nine days later, tells the SASCO, we're all done. And then, the very next night. Excuse me, I think Judge Sotomayor has a question. I think I'm also puzzled, as the questions indicate my colleagues are. Did your client, did a SASCO, I understand that a SASCO's rights were contingent on the currency of the Blenheim agreement, but was there any legal obligation on the part of Textron in the Blenheim agreement or otherwise, that upon the cancellation of the Blenheim agreement, a SASCO was to receive some sort of notice, which it didn't receive? Is a contract matter, Your Honor? No, because we're not here on a contract claim. That's already been dismissed. So where does the obligation, where does the obligation to notify a SASCO, I mean, you seem to say that this was somehow very sneaky business to terminate the Blenheim agreement and not tell a SASCO, right? And my first reaction is, if my rights were dependent on a third party agreement, I would take some precautions to make sure that I was informed if something happened to that agreement. Is there any evidence of any efforts on the part of a SASCO to assure itself that the Blenheim agreement remained in effect? The month after, there's a dispute of fact as to when a SASCO found out that the Blenheim agreement had been cancelled. You're missing, perhaps deliberately missing. No, I'm not. Would you answer the question, what is the source of an obligation to have notified your client prior to the termination of the Blenheim contract? There is no contractual obligation. But your further arguments depend on some notion that when TSC has no legal obligation whatsoever, and your client could have built it in, but your client did not, that somehow this then leads to a conclusion of bad faith. It's that there was a misrepresentation that a SASCO would be paid for offsets when it's clear. And please, page 92-0. It was never, it was always contingent on something else. Counsel, if I might just supplement that. Yeah, go ahead. It seems that in the final analysis, what you're saying, we're sort of back to the beginning of this relationship in this sense. It was understood that your client could not get a commission if the, if Textron was successful in winning the big contract for these cluster bombs. You seem to be saying now, after all these years and after all that's gone on, that that is what your client is entitled to, irrespective of the fact that they did never, they never obtained any offset, Textron never got any offset relationship to the efforts of your client with Saudi Arabia, never obtained the irrevocable waiver that was noted in the Blenheim-Textron agreement. So now you're back to the proposition that your client is entitled to a commission, when from the very beginning it was clear that your client is not entitled to a commission just for the success that Textron obtained in getting his contract. Isn't that your position? Your Honor, my time is up, but may I please respond to that? Yes. No, we're not saying we're entitled to a commission. Here's what we're saying as quickly as I can. We were cut out of our right, not a contractual right, but a right based on the representations made to work on the offsets and either get offset credits or get a waiver. And that right was eliminated when we were terminated in August of 2013 and TSC went and hired a new offset provider. And what we would say is our damages, our expectation, was the value of participating in that offset work would be approximately 6% of the value of the contract. Thank you. Thank you. That clarification helps. Mr. Tarantino. May it please the Court. John Tarantino for Textron Systems Corporation. So as the Court is aware, there were two relationships between Textron and ASASCO. Both were contractual. There was a contractual consultancy agreement that went on for almost a decade and there was a contractual relationship between Blenheim and Textron and then there was a subcontract, and that's what it's called. There is a subcontract relationship between Blenheim and ASASCO. As Judge Satos recognized, the subcontractor cannot have greater rights than the contractor has. The subcontractor's rights derive from the contractor's rights. And not only is that clear as a matter of law, it's what the contract says, and it specifically says that Mr. Tarantino, I'm sorry, the facts here are complicated, but I don't think he's making a breach of contract claim. I think he's saying, look, we understood representations were made to us that we would have the chance to earn some money, not commission money, but money for work on an offset. One of the mechanisms was the Blenheim contract. Okay, that went, but the representation that we would be able to get some benefit out of this if we worked on offset continued. Now, part of your argument has to be you never met the two conditions of an explicit offset agreement or a waiver. They never met either. Okay, but isn't this focus on the Blenheim agreement in some senses a red herring? Well, I believe that the Blenheim agreement makes clear in the Blenheim agreement that the subcontractor, that's ASASCO, is not going to claim, it's what it says, represents that this agreement between Blenheim and ASASCO isn't going to create any relationship, contractual or otherwise, between ASASCO. The importance of the Blenheim agreement is that it established the two conditions under which ASASCO could earn the money that it thought it should get for helping secure these contracts. Correct. One was by achieving these offset arrangements or by obtaining the waiver. I think I now understand the position to be that they were never given the opportunity to obtain the offset. You're saying they never did it. They're saying you never gave them the chance to do it. How do you respond to that latter contention that you never gave them the chance to do it, to get the offset? Two things, Your Honor. The chance derives from the agreement. There's no independent chance to do it. The chance derives from the Blenheim-ASASCO agreement. See, that's where there's a fundamental failure of meeting of the minds because if I understand your brother's argument, he says that the chance derives from the representations that Textron was making to ASASCO and that the subcontract with Blenheim was just a vehicle that was in place at one time which could have allowed the accomplishment, the fulfillment of those representations, but that wasn't necessary to the fulfillment, that the representations were an independent obligation. I'm not saying that the record supports that, but that's your brother's argument as I understand it. I would say two things with respect to that. First, both the Textron-ASASCO consultancy agreement have an integration clause and a clause that says there are no other agreements, any oral promises, any representations. Well, we spoke to that in our later decision. So, with respect to any of these representations, which were supposedly made early in time in different countries, Cairo and Saudi Arabia, they're merged into that consultancy agreement and it's signed, every page is initialed by Mr. Al-Tazan and it's signed. There's also an integration clause in the Blenheim-ASASCO agreement. So, where do these representations come from? They can't just be in the atmosphere. To the extent that there were any representations, they predated. As my brother was saying, they predated. They're going back to 2006. They predate these agreements. The agreements have merger clauses. The merger clauses say there are no representations. They're merged into the agreement. These are your rights. I believe Judge Al-Taz has a question. That's fine. Please, go ahead. Thank you. They're merged into these agreements. But the second thing is, and I believe Judge Lopez was referring to this, and so did Judge Sarris, they gave ASASCO an opportunity. They gave ASASCO and Blenheim opportunities. And when ASASCO came forward with projects, ASASCO-Blenheim came forward with projects, as Judge Lynch said, it's not up to Textron if they think it's a good project. It's up to the Kingdom of Saudi Arabia. The projects, when you say gave them an opportunity, what is the time frame that you're talking about? This was in the 2000, from the time of the Blenheim agreement until Blenheim was terminated, which would have been in January of 2011. And what about subsequent to August of 2013, when TSC notifies ASASCO that it's not going to resolve a consultant's agreement, there are no outstanding obligations between the parties, what about subsequent to that? Textron received no projects, zero, from ASASCO from the point in time when ASASCO submitted its last project, which was rejected outright by the Kingdom of Saudi Arabia. So from that point in time in 2011 all the way through the end of the relationship in August of 2013, there wasn't a single project submitted by ASASCO. So if ASASCO believed it had not been terminated as a result of the termination of the Blenheim agreement, then as Judge Sarra said, there was not a single project, not an idea, nothing came up in three years. Textron had received nothing from ASASCO to present. Let me ask you about the rejection of the pilot project. There is a suggestion in this record that the rejection from the Saudi government was very pointed in the sense that it was suggesting that Textron should perhaps think of someone else to be involved in these offset projects. Is that a fair reading of what was being communicated? It's a fair reading. I think what's particularly important about that is, again, no one disputes. The Kingdom of Saudi Arabia is the authority that says we either accept or reject these. It said some interesting things in that communication. It said, don't be embarrassed. Mr. Al-Tazan was asked in his deposition, did the Kingdom of Saudi Arabia know that you and Blenheim were the providers? He said, yes. It says, we need someone with in-Kingdom capability who can meet with us face-to-face. Now, at that point in time, when Textron reads that, says they don't like this proposal, they want someone who can meet with them face-to-face. We didn't know then, and clearly didn't know at the time of the first ASASCO, that Mr. Al-Tazan couldn't be in-Kingdom and couldn't meet face-to-face with the Saudi officials because he had fled the country. And so, if the regulator here is saying, don't submit proposals to us that are embarrassing, we need someone who has in-Kingdom capability and can meet with us face-to-face. Yeah, but this is a sort of harmless error argument. The first argument is, they weren't deprived of any opportunities. They just didn't come up with any of these projects. So, maybe if they had, you would have turned them down on the basis of the Saudis' distaste for the principle of Aramco. But you never got there. We never got there. There was never anything presented. And at the hearing on the motion for summary judgment, it's in the transcript, the judge said, can you point to anything, anything in the record where you did anything, where you submitted something and you were frustrated by text crime, where text crime interfered with your ability to make a presentation. Can you give me something? And counsel said, I can't point to anything. And Judge Saris asked me, and I said, there is nothing. There is zero in the record. And she said, we will go back and scour the record to see if there is anything. There was nothing presented. And so, how could text crime have interfered with the SASCO's ability to provide offset programs if a SASCO never presented anything? It's not text crime frustrating a SASCO at all. It's total, call it non-performance, non-engagement by a SASCO. And I believe, and Judge Saris points this out, is that a SASCO knew. It knew that the Brenham agreement had been canceled. And she points to the e-mail that we referred to it, where a SASCO's principal, Mr. Altazan, writes to his assistant. You mean they knew before Textron told them? Excuse me? They knew before Textron told them? They knew either before Textron told them or after Textron told them, which Mr. Boyle says was in May of 2012. This is in May 30th of 2012. If you recall, it's an interesting language, our previous agreement with Blenheim. If they believe they have an agreement with Blenheim that's in effect, why would you ever refer to it as our previous agreement with Blenheim? And then he goes on to say, now Blenheim is out of the picture. So we don't know how to deal with this. And then he goes on to say, we must find some way to tangle ourselves up with Textron in any fashion, under any arrangement, while we try slowly to get our fees. So he claims he doesn't know the agreement's been terminated. He claims he's acting to present all these projects, none of which he ever does. There's no evidence of anything submitted. And he refers to the Blenheim agreement as our previous agreement, and now Blenheim is out of the picture. So subsequent to the termination of the Blenheim agreement, which had the effect of terminating the Blenheim-ASASCO agreement, what indications were there from Textron to ASASCO that Textron was still open to working with ASASCO to try to obtain offsets? There were still meetings. There were still meetings. They still talked about, never in person, never in person in Saudi Arabia, but by phone or meetings in other countries about potential offset projects. But nothing was ever submitted by ASASCO. With those agreements, the Textron-Blenheim agreement, the Blenheim-ASASCO agreement, with those having been terminated, and those are the agreements that set forth the terms of compensation that ASASCO would be entitled to, what would have been the terms of compensation through this continuing relationship which you say existed between Textron and ASASCO? If the offsets had been successful, what would have been the basis for figuring out the compensation that ASASCO would have been entitled to in the absence of those agreements which had set the compensation? There would have been none. They would have had to reach some agreement. ASASCO would have had to come forward with some project if the project was something that Textron believed was viable. But we're talking about they never did. So, Your Honor, you're saying, well, what if they did? Well, I suppose if they did, they would determine is it a viable project and does Textron want to have some other relationship with ASASCO contractually and they would either negotiate or come to some agreement. But it never happened. It simply never happened. There never was a project for Textron to say yea or nay on. So you say there were discussions of possible projects, but nothing specific ever materialized. Well, there's nothing ever materialized. Thank you, Your Honor. Thank you. Mr. Gaynor. Thank you, Your Honor. So that's the point, Judge Lipitz. There were some continuing discussions, but there were no formal projects presented by ASASCO after those initial ones from 2006, okay? But then, this is why I keep coming back to 2013, August of 2013, when the deal finally gets locked in because that's when the United States government signs the supply contract with Textron in August of 2013. And nine days later, then they cut ASASCO off. And then shortly thereafter, they hire a different company called the Quincy Group to do offsets. And that agreement can be found at Appendix Page 5950, and that shows what the Quincy Group was going to get paid for offsets. But as we sit here, as I went here today. Excuse me a minute, counsel. You say they cut ASASCO off. My understanding is the consulting agreement expired and they didn't renew it. That's the consulting agreement. But in the letter, in the email, where they said we're not going to enter into a new consulting agreement, they said we are unaware of any other obligations between the parties. Yeah, and what obligations? To participate in the offsets pursuant to the conversations. And where does that obligation come from? The conversations, the representations that ASASCO is going to be able to participate in offsets. Mr. Tarantino has just argued, I think rather convincingly, that these written agreements, all of which have either expired or been terminated by this time, all right, have integration clauses that soak up any prior representations. You mean the integration clauses in the consulting agreement? In the consulting agreement, in the subcontract agreement with Blenheim, et cetera. Okay, two separate things. The consulting agreements are for the services under the consulting agreements, and that was really the subject of this court's first decision. To the extent there are integration clauses in the Blenheim agreement or the ASASCO Blenheim agreement. Subcontract. Subcontract. Those were all terminated by TSC in November of 2011, about 24 days before the LOA was signed. All right. I hope that answered the question. It does. Mr. Tarantino has represented that there were continuing discussions about offset projects, but that your client never came up with a proposal after the one the Saudis rejected. Is this true? Yes, as I said, there were no more formal proposals along the lines of the Cessna and the aircraft shelters and these other things that are in the record. But there were conversations, and the fundamental point is time wasn't up. Time is still not up. The offsets have still not been done. TSC right now is still waiting for Saudi Arabia to enter into a formal memorandum of offsets in order to do this. That's why we have the de facto waiver evidence. Okay. You have answered my question. Thank you. Thank you very much. Thank you.